J-S54031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INT. OF: M.I.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M., JR., FATHER | No. 658 MDA 2014 |

Appeal from the Decree dated March 17, 2014
In the Court of Common Pleas of Berks County
Orphans' Court at No: 83206

BEFORE:  LAZARUS, MUNDY, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 02, 2014**

Appellant A.M., Jr. (Father) appeals from the March 17, 2014, decree of the Court of Common Pleas of Berks County (orphans' court), which granted Berks County Office of Children and Youth Service's (CYS) petition to involuntarily terminate his parental rights to his female child, M.I.M. (Child), pursuant to Section 2511(a)(2) and (b) of the Adoption Act (Act).[1] Appellant's counsel has filed a petition to withdraw, alleging that this appeal is wholly frivolous, and filed a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).  For the reasons set forth below, we affirm and grant the petition to withdraw.

_____

[1] Act of October 15, 1985, P.L. 934, **as amended**, 23 Pa.C.S. §§ 2101-2938.

On June 27, 2013, CYS filed a petition for involuntary termination in the orphans' court, requesting that Father's parental rights to Child, who was born on July 17, 2010, be extinguished under Section 2511(a)(1), (2), (5), (8) and (b) of the Act.[2]  Involuntary Termination Petition, 6/27/13, at ¶¶ 6-9.  In support of its termination petition, CYS alleged that Father (1) "has a lengthy history of criminal activity and repeated incarcerations," (2) "has failed to show progress with his parenting skills," and (3) "has failed to remediate his substance abuse."  *Id.* at ¶ 10.  CYS also alleged "concerns remain regarding [Father's] mental health."  *Id.*

Following the appointment of counsel, the orphans' court held a hearing on CYS's termination petition.  At the hearing, CYS presented the testimony of one of its caseworkers, Brooke Laws.  Ms. Laws testified that on May 16, 2012, "[Child] came into our custody's attention due to [Mother's] lack of stability.  [Mother] was everywhere, all over the place, did not have stable employment or housing and did admit to smoking K2, using drugs, and things like that."  N.T. Hearing, 3/17/14, at 8.  Ms. Laws further testified that Father was incarcerated at the time CYS assumed custody of Child and

---

[2] On March 17, 2014, the orphans' court granted CYS's motion to withdraw its termination petition against Child's biological mother, M.D. (Mother), because Mother had signed an affidavit of consent for Child's adoption. Orphans' Court Decree, 3/17/14.  On the same day, the orphans' court entered a decree extinguishing Mother's parental rights to Child.  In so doing, the court found that Mother had voluntarily relinquished said rights. Orphans' Court  Final Decree, 3/17/14.

has since been ordered to cooperate with CYS. *Id.* She also testified that, since CYS assumed custody of Child, Father has sent four letters to Child, in which he discussed "why [Child] wasn't placed with family members." *Id.* at 9. Ms. Laws noted that the letters "did not state that he was engaged in any services or that he was doing anything while incarcerated to get [Child] back." *Id.* According to Ms. Laws, from September 28, 2012 to March 22, 2013, Child "was placed with Father's sister." *Id.* at 10. Ms. Laws testified:

> [Father's sister] felt threatened by the letters that Father was sending her and did not feel as though once Father is released from SCI Forest that they would be able to keep [Child] safe because he was saying things like, I'm going to fight for my daughter [(Child)] when I get out of jail. His sister knows him better than we do. She felt threatened by the letter and she asked for the removal. It was not us that removed [Child]. It was [Father's sister] that said she could no longer care for [Child].

*Id.* Addressing Father's criminal history, Ms. Laws testified that Father had an extensive criminal record dating back to 1997. *Id.* at 10-11. Specifically, she claimed that Father had been "in and out of prison" since 1997 for aggravated assault, simple assault, "recklessly endangering another person, possession of a firearm, possession of weapon and making repairs, selling weapons." *Id.* at 10, 14. Ms. Laws also testified that Father had not relayed to her that he would mend his criminal behavior. *Id.* at 11. In response to the question whether Father "compl[ied] with taking any parenting education while incarcerated[,]" Ms. Laws testified "no." *Id.*

> Describing Child, Ms. Laws testified:

> [Child] is a very happy little girl. She's very energetic, so you always have to keep an eye on her, for sure. She's really thriving in this current foster home. And really, the foster

parents have gone above and beyond to do what they need to do to get [Child] in play therapy, Head Start. And so we have a kid that's finally bonding and connecting to someone and is doing it appropriately with the therapy involved to help her in the process.

*Id.* at 11-12. In addition, Ms. Laws remarked that she has had an opportunity to observe Child with the foster parents, who are a long-term resource for Child. *Id.* at 12. Specifically, Ms. Laws testified "[Child] calls them "mom" and "dad," which I think is very telling. We have a little girl that is—has adjusted into that home, enjoys playing with the foster siblings, as well, and the extended family all really, really cater to her and enjoy having her." *Id.* Describing the effects of involuntary termination of Father's rights, Ms. Laws testified "[t]here would be no effect. He has not been in [Child's] life; and so there is no current bond or existing connection between [Father] and [Child]." *Id.* Ms. Laws' testimony also indicates that Child never asks for her biological parents. *Id.* at 12-13.

With respect to CYS's recommendation in this matter, Ms. Laws testified:

> We would request that termination of parental rights in regards to Father . . . happen today so that [Child] can move on and really have a good, long relationship with this family. The pre-adoptive family is willing to keep contact with the biological mother, as she has taken steps to improve her; just not in enough time for [Child], for her permanency, but she is doing well and doing better, so the adoptive family is willing to keep in contact with her. . . . If Father, you know, can create a relationship with the adoptive long-term resource for [Child], as long as it's within the best interests of [Child], the family said they were willing to do that. The fact that Father doesn't have current connection or bond with [Child], that might defer [sic] that from happening, but if Father comes out and is appropriate and does what he needs to do, maybe not right now, but even years down the road, I see this family being open to that.

*Id.* at 13-14. Finally, Ms. Laws testified that Father's earliest release date from prison would be September 15, 2015. *Id.* at 9.

In response, Father testified that he agreed with Ms. Laws' testimony to the extent that his earliest release date is September 2015. *Id.* at 21. Father testified that the last time he saw Child was in July 2011, when Child visited him at SCI Camp Hill. *Id.* Father also testified that, upon his release, he would cooperate with Child's adoptive family, because "[he] would do anything to be back with [Child]." *Id.* at 22. Father testified:

> I'm not a perfect person. I made a lot of mistakes in my life, a lot, you know, but my daughter means the world to me. The day that little girl was born, I started changing my life around before I caught this case. And what I'm in jail for now, you know, it's—I got—I got locked up—something stupid. It had nothing to do with me. I went to a party. My brother got shot. I picked it up and started shooting back. Due the fact I got a criminal record and they had me on video, shooting a gun. I didn't go through any trouble. I was relaxing, doing everything I was asked to do. I was going to college, Reading Area [Community] College. I was trying to get my business degree, I was taking care of my family. I was working part-time as a mechanic in my cousin's garage. I was doing everything right until I caught this case.

*Id.* at 22-23. Finally, he testified that he completed a parenting program at the prison and was currently enrolled "in the violence prevention class." *Id.* at 21.

On cross-examination, Father admitted to pleading guilty and being sentenced to four to twenty-four months' imprisonment for theft by unlawful taking in 1997. *Id.* at 23. Father also admitted that in 1998 he "pled guilty to missiles onto a roadway and corruption of minors and sentenced with one to two years of confinement[.]" *Id.* at 24. Father admitted that in 1998, he

also "pled guilty to burglary and was sentenced to confinement with a minimum of 11 months and a maximum of 24 months." *Id.* Likewise, Father admitted to another guilty plea and sentence for burglary in 1998. *Id.* at 25. According to Father, in 2002 he "pled guilty to criminal mischief-tampering with property, theft by unlawful taking-movable property and criminal trespassing-entering a structure," and sentenced to two to four years' imprisonment. *Id.* Father further admitted that in 2009, he pled guilty to retail theft and sentenced to 9 to 24 months' imprisonment. *Id.* at 26. Father lastly admitted that in 2010, he "pled guilty to recklessly endangering another person and possession of a firearm" and sentenced to 5 to ten years' imprisonment.[3] *Id.*

Disputing the claim that his sister's fear of him caused his sister to release Child to CYS's custody, Father remarked:

> [W]e had a misunderstanding because I wanted my sister to bring my daughter [Child] up. . . . I said I have a right to see my daughter. We got into a big-ass argument. I'm not going to sit there and not fight for my daughter. This is my child.

*Id.* at 29.

At the close of the hearing, the orphans' court granted CYS's involuntary termination petition, extinguishing Father's parental rights. In so doing, the orphans' court specifically found:

> [Father] has a repeated pattern of criminal activity that has begun in 1997 and has continued through today's date, to which

---

[3] The charges were filed on September 15, 2010. N.T. Hearing, 3/17/14, at 26.

he is currently serving a sentence of one to two years on aggravated assault and five to ten on firearms. [The orphans' court] is not terminating [Father's] rights because he is incarcerated.

. . . .

The [orphans' court] finds that [Father] has clearly failed to perform any parental duties, noting from [CYS's] caseworker that I believe it was a total of five or six letters that [he had sent]; only one of those letters was prior to when the notice was sent out from termination. The remainder of the letters to [Child] came out after the fact. The letters were not directed toward his daughter but they were also directed towards CYS. I find that [Father] has failed to provide a serious intent on his part to re-cultivate a parent-child relationship with [Child]. . . . I find that [Father] doesn't exhibit a willingness and capacity to undertake a parental role. That is exhibited from his repeated criminal activity, his possession of firearms, his shooting at other people in the street.

The [orphans' court] has carefully considered the needs and welfare in the best interests of [Child], and CYS has found a loving home for [Child], has bonded with these people, calling these people "mom" and "dad," and the pre-adoptive family has had an extended family that have embraced [Child]. She is in a comfortable setting, she is secure, she is attending appropriate schooling.

*Id.* at 34-37. Father appealed to this Court. Following Father's filing of a statement of errors complained of on appeal, the orphans' court issued a Pa.R.A.P. 1925(a) opinion. In its Rule 1925(a) opinion, the court concluded that the involuntary termination of Father's parental rights was proper under Section 2511(a)(2) of the Act. Orphans' Court Opinion, 5/17/14, at 1. Specifically, the orphans' court reasoned:

[A]s a result of [Father's] ongoing, conscientious, and deliberate criminal involvement, current long-term incarceration, substantial lack of effort towards reunification [with Child], and interference with positive familial placement that [Father's] actions constituted an incapacity and refusal to discharge essential parental duties to [Child's] detriment. Further it can be surely asserted that [Father's] continued criminal actions and subsequent incarcerations are a primary reason for [Child's] placement with CYS. The [orphans' court] concludes that [Father's] continual involvement in criminal activity, despite knowledge of a penalty those acts carry and his daughter's

[Child's] needs for parental care and CYS placement constitutes and [sic] an outright refusal to remedy the conditions resulting in her placement.

*Id.* at 3.

On June 19, 2014, Father's counsel filed a motion to withdraw as counsel and an *Anders* brief, wherein counsel raises a single issue:

Did the [orphans' court] err by terminating Appellant's parental rights because the evidence presented by Appellee [CYS] was insufficient to support the [orphans'] court's decision?

*Anders* Brief at 4.

We first address Father's counsel's motion to withdraw and then the issue in the *Anders* brief. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) (quotation omitted) (noting "[w]hen faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw").

In *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. We held that "counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition this [C]ourt for leave to withdraw representation" and submit an *Anders* brief. *Id.* at 1275.

When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first examining counsel's petition to withdraw. *Commonwealth v. Goodwin*, 928 A.2d 287, 290 (Pa. Super.

2007) (*en banc*). It is well-established that, in requesting a withdrawal, counsel must satisfy the following procedural requirements: 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) provide a copy of the brief to the defendant; and 3) advise the defendant that he or she has the right to retain private counsel, proceed *pro se* or raise additional arguments that the defendant considers worthy of the court's addition. ***Commonwealth v. Lilley***, 978 A.2d 995, 997 (Pa. Super. 2009).

Instantly, counsel's petition to withdraw from representation provides that counsel reviewed the record and concluded that the appeal is frivolous. Furthermore, counsel notified Father that he was seeking permission to withdraw and provided Father with copies of the petition to withdraw and his ***Anders*** brief. Counsel also advised Father of his right to retain new counsel, proceed *pro se*, or raise any additional points he deems worthy of this Court's attention. Accordingly, we conclude that counsel has satisfied the procedural requirements of ***Anders***.

We next must determine whether counsel's ***Anders*** brief complies with the substantive requirements of ***Santiago***, wherein our Supreme Court held:

> [I]n the ***Anders*** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's

reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. Here, our review of counsel's brief indicates that he has complied with the briefing requirements of *Santiago*. We, therefore, conclude that counsel has satisfied the minimum requirements of *Anders*/*Santiago*.

Once counsel has met his obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Santiago*, 978 A.2d at 355 n.5. Thus, we now turn to the merits of Father's appeal.[4]

_____

[4] We review this appeal according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [] 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.,* 36 A.3d [567,] 572 [(Pa. 2011)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel−Bassett v. Kia Motors America, Inc.*, [] 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, [] 838 A.2d 630, 634 ([Pa.] 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As . . . discussed in *R.J.T.,* there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during

*(Footnote Continued Next Page)*

Section 2511 of the Act governs the termination of parental rights and, in so doing, requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

*(Footnote Continued)* _____

> the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [] 650 A.2d 1064, 1066 ([Pa.] 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

In this case, we conclude the orphans' court properly terminated Father's parental rights under Section 2511(a)(2) and (b), which provide:[5]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>   . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>   . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

To satisfy the requirements of Section 2511(a)(2), the petitioning party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without

_____

[5] We need only agree with any one subsection of Section 2511(a) of the Act to affirm the termination of parental rights. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), **appeal denied**, 863 A.2d 1141 (Pa. 2004).

- 12 -

essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), as a result of incapacity that cannot be remedied, are not limited to affirmative misconduct. *See In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). "To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."[6] *Id.* A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Instantly, based on our review of the record, we conclude that the orphans' court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). As the orphans' court specifically found:

> [Father] has a history of repeated, consistent, and continued incapacity due to multiple long-term incarcerations, which have led [Child] to be deprived of essential care and caused her to be placed in foster care. CYS indicated that [Father] has been

---

[6] Our Supreme Court held:

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*In re Adoption of S.P.*, 47 A.3d at 830.

incarcerated on multiple unrelated criminal charges, with only brief, periodic terms of release since 1997. During this time [Father] knew that he had a minor child that required his care and knowingly failed to cease his involvement in criminal activity, resulting in additional lengthy imprisonments. [Father] is currently serving a 5 to 10 year sentence in a State Correctional Institution, with an earliest possible release date of September 15, 2015. Upon cross-examination [Father] admitted to pleading guilty to several offenses and serving their respective sentences. Further [Father] admitted that at the time of his most recent offense that he engaged in the criminal acts regardless of the fact that he had a daughter who was currently in placement and in desperate need of his parental care.

CYS presented evidence which indicated that [Child] was initially in the care of her biological mother. However, as a result of mother's serious substance and psychiatric issues, she was deemed incapable of adequately caring for the child. Thus, due to mother's incapacity and [F]ather's incarceration, [Child] came into the care of Berks County CYS. [Child's] case worker testified that at the outset of their involvement CYS attempted to place [Child] with [Father's] family in hopes of achieving familial reunification for the child. However, after receiving threatening messages from [Father], his family returned [Child] to CYS's care. On cross-examination, [Father] qualified his threats as a "misunderstanding". Regardless, as a result of his actions, CYS's reunification goals were thwarted, [Child] was returned to CYS and placed in non-familial foster care.

Additionally, CYS presented evidence indicating that while incarcerated [Father] did not pursue any avenues for reunification prior to CYS's petition to terminate his rights. While [Father] indicated and CYS confirmed that [Father] did participate in some institution-offered parenting and violence prevention courses and wrote approximately four letters to his daughter, none of these efforts occurred *prior* to the agency's petition to terminate his rights. Further, CYS indicated that the letters were not addressed to his daughter but rather to the agency. In addition to his lack of communication or efforts to participate in reunification procedures, [Father] admitted on cross-examination that he has not seen his daughter since 2011, nearly three years ago.

Orphans' Court Opinion, 5/17/14, at 1-2 (emphasis added). Given the court's factual findings that are supported by the record, we agree with the orphans' court's conclusion that "[Father's] ongoing, conscientious and deliberate criminal involvement, current long-term incarceration, substantial lack of effort towards reunification, and interference with positive familial

placement . . . constituted an incapacity and refusal [on Father's part] to discharge essential parental duties to [Child's] detriment." *Id.* at 2.

Given the requisite bifurcated analysis in termination matters, we now review the orphans' court's decree under Section 2511(b) of the Act, which pertains to the developmental, physical and emotional needs and welfare of children. Under Section 2511(b) of the Act, we must determine specifically whether the termination of Father's parental rights would best serve the developmental, physical and emotional needs and welfare of Child. *In re C.M.S*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). In so determining, we "must also discern the nature and status of the parent-child bond, with the utmost attention to the effect of permanently severing that bond on [Child]." *Id.* at 1287 ("Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."); *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa. Super. 2007) (explaining that "a court must take into account . . . whether termination would destroy an existing, necessary and beneficial relationship"), *appeal denied*, 951 A.2d 1165 (Pa. 2008). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Our Supreme Court has stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."

- 15 -

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

Here, based on our review of the evidence, we discern no reason to conclude that the orphans' court abused its discretion in determining that the termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of Child under Section 2511(b). The court specifically found:

> CYS presented evidence that [Child] is in a long-term placement and is thriving. CYS presented further evidence regarding the status of [Child's] placement, indicating that [Child] refers to her foster parents as "mom" and "dad" and that foster parents will seek to adopt the child pending the final disposition of [Father's] termination proceedings. Finally, on cross-examination, [Father] admitted it would be unfair for his daughter's life to be put on hold while he pays his debts to society for his prior criminal wrongdoings.

Orphans' Court Opinion, 5/17/14, at 3. We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004), *appeal denied*, 872

A.2d 1200 (Pa. 2005). Accordingly, we affirm the decree terminating Father's parental rights under Section 2511(a)(2) and (b) of the Act.

Decree affirmed. Motion to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/2014